# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## CASE NO. 24-10174-D

---

TAMARA BAINES,

*Plaintiff-Appellant,*

v.

CITY OF ATLANTA, GEORGIA and
ROBIN SHAHAR in her Individual Capacity,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE THOMAS W. THRASH, JR.
CASE NO. 1:19-cv-00279-TWT

---

## APPELLANT TAMARA BAINES'S OPENING BRIEF

---

CHERYL B. LEGARE
MARISSA R. TORGERSON
LEGARE, ATTWOOD & WOLFE, LLC
125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
(470) 823-4000

*Counsel for Appellant Tamara Baines*

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Eleventh Circuit Rule 26.1, the undersigned counsel of record verifies that those persons or entities listed below have or may have an interest in the outcome of this case:

Anand, Justin S.  – Magistrate Judge, United States District Court

Baker Donelson Berman Caldwell & Berkowitz, P.C. – GA – Counsel for Appellee, City of Atlanta and Robin Shahar

Baines, Tamara – Appellant/Plaintiff

City of Atlanta, Georgia – Appellee/Defendant

Employment Law Solutions: McFadden Davis, LLC – Counsel for City of Atlanta

Gevertz, David E. – Counsel for Appellee, City of Atlanta and Robin Shahar

Jarrells, Hannah E. – Counsel for Appellee, City of Atlanta and Robin Shahar

Lambert, Lisa C. – Counsel for Appellant

Law Office of Lisa Lambert – Counsel for Appellant

Legare, Attwood & Wolfe, LLC – Counsel for Appellant

Legare, Cheryl B. – Counsel for Appellant

Lewis, Suzanne – Counsel for Appellee, City of Atlanta and Robin Shahar

McFadden, Jamala S. – Counsel for Appellee, City of Atlanta

Thrash, Thomas W. – Senior Judge, United States District Court

Torgerson, Marissa R. – Counsel for Appellant

White, Halima H. – Counsel for Appellee, City of Atlanta

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant Tamara Baines requests oral argument and submits that oral argument will assist the Court's disposition of this case in focusing on the issues and testing the basis and validity of the contentions of the Parties.

# <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................i

TABLE OF AUTHORITIES ....................................................iv

JURISDICTIONAL STATEMENT ...........................................ix

STATEMENT OF THE ISSUES..............................................1

    Issues as to Appellee Robin Shahar................................1

    Issues as to Appellee City of Atlanta ............................1

Statement of the Case..........................................................3

    I.     Statement of Facts ................................................3

          A.    Baines was targeted due to her disability....................3

          B.    Shahar repeatedly sexually harassed Baines................4

          C.    Another City Attorney, Maiysha Rashad, sexually
harassed Baines ................................................5

          D.    The City repeatedly ignores Baines's complaints ........6

          E.    Baines rejects Shahar's quid pro quo proposition ........8

          F.    After Shahar's quid pro quo proposition, Baines
required FMLA ................................................10

          G.    Yancy, Hampton, Patrick, and Shahar conspire with
Gevertz to terminate Baines................................11

          H.    Following the sham FFD, the City terminated Baines ............15

    II.    Course of Proceedings and Disposition Below..................18

    III.    Standard of Review ............................................19

SUMMARY OF ARGUMENT ..............................................20

ARGUMENT ....................................................................21

IV.  Baines's Sexual Harassment Claims were Improperly
      Dismissed ..........................................................................21

      A.    Shahar cannot escape the consequences of her
            harassment extending through 2017 .........................21

      B.    Under the totality of the circumstances, Shahar's
            harassment was severe and pervasive ......................25

      C.    The statute of limitations was tolled .........................26

      D.    The City is liable under Monell ................................27

      E.    Baines exhausted her administrative remedies ........31

V.   Baines' ADA claim was improperly dismissed ...................34

      A.    The City failed to accommodate Baines ...................34

      B.    The Lower Court's reliance on *Todd* is misplaced ...35

VI.  Baines's FMLA Interference Claim ...................................38

      A.    The City failed to reinstate and accommodate Baines..............38

      B.    The City committed other FMLA violations ............39

VII. Retaliation and Pretext .......................................................42

      A.    The City used the FFD to retaliate against Baines ...42

      B.    Substantial evidence of pretext ................................44

            1.    Pretext for the FFD .........................................44

            2.    Pretext for the termination ..............................49

VIII. Privilege Inapplicable or Waive ........................................51

IX.  Sanctions for *Ex Parte* Communications and Violation of the
      Protective Order ..................................................................53

CONCLUSION .......................................................................................55

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*A.L. v. Walt Disney Parks & Resorts US, Inc.*,
  900 F.3d 1270 (11th Cir. 2018) ............................................................... 19

*AMTRAK v. Morgan*,
  536 U.S. 101 (2002) ................................................................................ 24

*Baker v. Wellstar Health Sys.*,
  288 Ga. 336 (2010) .................................................................................. 54

*Bass v. Bd. of County Com'rs, Orange County, Fla.*,
  256 F.3d 1095 (11th Cir. 2001) ............................................................... 51

*Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.*,
  713 F.2d 618 (11th Cir. 1983) ................................................................. 29

*Brownfield v. City of Yakima*,
  612 F.3d 1140 (9th Cir. 2010) ................................................................. 41

*Brumbalough v. Camelot Care Ctrs., Inc.*,
  427 F.3d 996 (6th Cir. 2005) ................................................................... 40

*Burlington Indus. v. Ellerth*,
  524 U.S. 742 (1998) ................................................................................ 25

*Burlington Northern Santa Fe Ry. v. White*,
  548 U.S. 53 (2006) .................................................................................. 43

*Chanda v. Engelhard/ICC*,
  234 F.3d 1219 (11th Cir. 2000) ............................................................... 33

*Connor v. Fort Gordon Bus Co.*,
  761 F.2d 1495 (11th Cir. 1985) ............................................................... 47

*Cox v. Administrator United States Steel & Carnegie*,
  17 F.3d 1386 (11th Cir. 1994) ................................................................. 53

*Cross v. State of Ala.*,
  49 F.3d 1490 (11th Cir. 1995) ................................................................. 22

*Depew v. City of St. Marys, Georgia*,
  787 F.2d 1496 (11th Cir. 1986) ............................................................... 29

*Dickey v. Crawford Cty. Sch. Dist.*,
  928 F. Supp. 2d 1342 (M.D. Ga. 2013) ................................................48

*Donnellon v. Fruehauf Corp.*,
  794 F.2d 598 (11th Cir. 1986) ............................................................44

*Drummond Co. v. Conrad & Scherer*,
  885 F.3d 1324 (11th Cir. 2018) ..........................................................52

*Dykstra v. Fla. Foreclosure Attys., PLLC*,
  183 F. Supp. 3d 1222 (S.D. Fla. 2016) ......................................... 39, 40

*Eres v. Progressive Am. Ins. Co.*,
  998 F.3d 1273 (11th Cir. 2021) ..........................................................19

*Fairchild v. Forma Sci.*,
  147 F.3d 567 (7th Cir. 1998) ..............................................................31

*Fuentes v. Classica Cruise Operator Ltd.*,
  32 F.4th 1311 (11th Cir. 2022) ...........................................................20

*Godwin v. WellStar Health Sys.*,
  615 Fed. Appx. 518 (11th Cir. 2015) ..................................................43

*Gregory v. Ga. Dep't of Human Res.*,
  355 F.3d 1277 (11th Cir. 2004) ..........................................................33

*Griffin v. City of Opa-Locka*,
  261 F.3d 1295 (11th Cir. 2001) ..................................................... 28, 29

*Holifield v. Reno*,
  115 F.3d 1555 (11th Cir.1997) ...........................................................49

*Hollingsworth v. O'Reilly Auto. Stores, Inc.*,
  No. 4:13-CV-01623-KOB, 2015 U.S. Dist. LEXIS 10956
  (N.D. Ala. Jan. 30, 2015) ...................................................................34

*Jackson-Hall v. Moss Point Sch. Dist.*,
  2012 U.S. Dist. LEXIS 45947 (S.D. Ms. Apr. 2, 2012) ......................23

*Johnson v. 27th Ave. Caraf, Inc.*,
  9 F.4th 1300 (11th Cir. 2021) .............................................................52

*Kelly v. Dun & Bradstreet Corp.*,
  457 Fed. Appx. 804 (11th Cir. Dec. 5, 2011) ......................................33

*Knox v. Roper Pump Co.*,
  957 F.3d 1237 (11th Cir. 2020) ..............................................................52

*Lawson v. Glover*,
  957 F.2d 801 (11th Cir. 1987) ........................................................ 26, 27

*Lozman v. City of Riviera Beach*,
  39 F. Supp. 3d 1392 (S.D. Fla. 2014) ...................................................28

*Lucas v. W.W. Grainger, Inc.*,
  257 F.3d 1249 (11th Cir. 2001) .............................................................34

*Martinez v. El Paso County*,
  710 F.2d 1102 (5th Cir. 1983) ..............................................................47

*McCann v. Tillman*,
  526 F.3d 1370 (11th Cir. 2008) ...................................................... 43, 44

*McMillan v. Dekalb Cty., Ga.*,
  2005 WL 5121850 (N.D.Ga. Dec. 15, 2005) ........................................48

*Meyer v. Gwinnett Cnty. Police Dep't*,
  2022 U.S. App. LEXIS 18399 (11th Cir. 2022) ............................. 52, 53

*Monell v. Dep't. of Soc. Servs.*,
  436 U.S. 658 (1978) ..................................................... 27, 28, 29

*Moreland v. Austin*,
  284 Ga. App. 730 (2008), *reversed on other grounds*, 284 Ga. 730 (2008)........54

*Nolen v. S. Bend Pub. Transp. Corp,*,
  99 F. Supp. 21d 953 (N.D. Ind. 2000) ...................................................23

*Oncale v. Sundowner Offshore Servs.*,
  523 U.S. 75 (1988) ................................................................................26

*Ortiz v. Waste Mgmt., Inc.*,
  808 Fed. Appx. 1010 (11th Cir. 2020) ..................................................31

*Owusu-Ansah v. Coca-Cola Co.*,
  715 F.3d 1306 (11th Cir. 2013) .............................................................36

*Parks v. City of Warner Robins*,
  841 F. Supp. 1205 (M.D. Ga. 1994) ......................................................24

*Pullman Co. v. Bullard,*
  44 F.2d 347 (5th Cir. 1930) ...................................................................29

*Rahn v. Olens,*
  No. 1:14-CV-3660, 2015 U.S. Dist. LEXIS 103516
  (N.D. Ga. Aug. 7, 2015) ........................................................................29

*Reeves v. C.H. Robinson Worldwide, Inc.*,
  594 F.3d 798 (11th Cir. 2010) ...............................................................25

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000) ...............................................................................46

*Sanchez v. Standard Brands, Inc.*,
  431 F.2d 455 (5th Cir. 1970) ......................................................... 31, 33

*Scarbary v. Ga. Dep't of Natural, Res.*,
  245 F. Supp. 3d 1328 (N.D. Ga. 2017) .................................................46

*Smith v. Lockheed-Martin Corp.*,
  644 F.3d 1321 (11th Cir. 2011) ..............................................................19

*Stewart v. Jones Util. & Contr. Co.,*
  806 Fed. Appx. 738 (11th Cir. 2020) .....................................................25

*Teleglobe Communs. Corp. v. BCE, Inc.*,
  493 F.3d 345 (3d Cir. 2007) ...................................................................52

*Todd v. Fayette Cnty. Sch. Dist.*,
  998 F.3d 1203 (11th Cir. May 27, 2021)................................................36

*Tolan v. Cotton,*
  527 U.S. 650 (2014) ...............................................................................19

*Tynes v. Fla. Dept of Juvenile Justice,* No. 21-13245,
  2023 U.S. App. LEXIS 32836 (11th Cir. Dec. 12, 2023) ............... 19, 20

*Vessels v. Atlanta Ind. Sch. Sys.*,
  408 F.3d 763 (11th Cir. 2005) ...............................................................48

*Wade v. Sec'y of Army,*
  796 F.2d 1369 (11th Cir. 1986) ..............................................................33

*Watson v. Blue Circle, Inc.*,
  324 F.3d 1252 (11th Cir. 2003) ..............................................................24

vii

*Wideman v. Wal-Mart Stores, Inc.*,
   141 F.3d 1453 (11th Cir. 1998) ............................................................42

**Statutes and Other Authorities:**

28 U.S.C. § 1291 ....................................................................................*ix*

28 U.S.C. § 2601 ......................................................................................19

29 C.F.R. § 1601.12(b) ...........................................................................33

29 C.F.R. § 1626.8(c) .............................................................................33

29 C.F.R. § 825.312(b) ................................................................ 39, 40, 41

29 C.F.R. § 825.312(e) ...........................................................................39

29 C.F.R. § 825.702(c)(4) ......................................................................38

42 U.S.C. § 1983 ............................... 1, 5, 7, 18, 21, 22, 26, 27, 29, 31

42 U.S.C. § 12101 ...................................................................................19

42 U.S.C. § 12112(b)(1) .........................................................................36

42 U.S.C. § 12112(b)(5) .........................................................................36

42 U.S.C. § 12112(d)(4)(a) ....................................................................36

42 U.S.C. § 12112(d)(4)(A) ...................................................................41

42 U.S.C. § 2000e ...................................................................................18

65 Fed. Reg. 82,462 (Dec. 28, 2000) ....................................................54

O.C.G.A. § 9-3-90 ...................................................................................27

## <u>JURISDICTIONAL STATEMENT</u>

This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal of a final decision of the United States District Court for the Northern District of Georgia.

## STATEMENT OF THE ISSUES

**Issues as to Appellee Robin Shahar:**

I.     Whether Baines's 42 U.S.C. § 1983 claim against Shahar was timely where Baines filed suit within two years of her termination from the hostile work environment and Baines's mental health crisis tolled § 1983's statute of limitations.

**Issues as to Appellee City of Atlanta:**

II.     Whether the City is liable under § 1983 where the City's top decisionmakers were the moving force behind subjecting Baines to sexual harassment.

III.     Whether Baines exhausted her administrative remedies regarding her Title VII sexual harassment claim where Baines filed her EEOC charge within 180 days of her termination and the City was complicit in violating Baines's civil rights.

IV.     Whether the City was motivated by discriminatory disability-related animus where, after exacerbating Baines's mental illness, the City targeted Baines because of her disabilities.

V.     Whether the City interfered with Baines's FMLA rights when it refused to reinstate Baines when she was released to return from FMLA and, instead, sent her for a sham FFD to terminate her employment.

VI.     Whether Baines's retaliation claims were viable under the ADA, the FMLA, and Title VII where following Baines's protected activity, the City subjected

1

her to a sham FFD to terminate her employment, and Baines proffered evidence that the City's excuses were pretextual.

VII.   Whether the City's emails detailing their scheme to terminate Baines Baines's are protected when they are exempt under the crime-fraud exception and given the City's selective disclosures.

VIII.   Whether defense counsel should be sanctioned after meeting *ex parte* with Baines's doctor and providing documents in violation of the protective order.

## Statement of the Case

### I.    <u>Statement of Facts</u>

This case is about the City's callous and discriminatory treatment of Tamara Baines, a disabled employee who reported multiple instances of sexual and other harassment by her functional supervisor (Shahar) and coworkers. After Baines repeatedly reported this harassment to the proper high-level City officials, those City officials weaponized her reports and terminated her employment.

#### A.    **Baines was targeted due to her disability.**

Baines was diagnosed with bipolar disorder and other mental health conditions and hospitalized several times from 2007 to 2009. (Doc. 253-1, 116:12-16, 125:1-4; Doc. 253-2, Exs. 14, 15, 21, 38; Doc. 253-7, 22:20-23:2, 38:2-9.) Throughout her employment with the City, Baines received psychotherapy and took medication on and off. (Doc. 253-1, 16:25-19:24, 58:9-20, 136:24-137:21, Exs. 14, 19; Doc. 253-7, 12:2-15.) Baines excelled as an attorney until she began missing days throughout 2016 due to the severity of the harassment. **(**Doc. 246-6.)

As Baines's mental health declined, Baines's coworkers, including Maiysha Rashad, referred to her as "weird" and "crazy." (Doc. 282-1, 69:13-14, 88:24-89:7; Doc. 256-1, 58:1-13, 59.) They also "[made] comments about a former colleague diagnosed with depression and as being 'crazy' and having to take 'crazy pills.'" (Doc. 253-1, 137:11-16; Doc. 246-8.) Baines stopped taking her medication because

3

her coworkers' comments made her fear for her employment. (Doc. 253-1, 137:11-16.) After Baines's breakdown, Hampton shared Baines's mental health with Burnette, after which Baines was stalked on social media by Burnette throughout 2017, calling Baines a "dyke" and "crazy Bitch." (Doc. 253-1, 204:14-22.)

### B.    Shahar repeatedly sexually harassed Baines.

Baines's mental decline began in around January 2016 when, shortly after City Attorney Cathy Hampton required Baines to work with Law Department Chief Counsel and LGBT Advisor to the Mayor Robin Shahar, Shahar began sexually harassing Baines by placing her hand on Baines's thigh and moving it near Baines's groin. (Doc. 253-1, 240:22-244:1, 246:8-247:1, 351:12-15; Doc. 297, 94:20-23, 96:7-9) Shahar's sexual harassment occurred more than twenty times, all of which Baines rejected. (Doc. 253-1, 240:22-241:14; Doc. 264-2, ¶ 61; Doc. 253-1, 246:23-247:5.) When Baines tried to avoid Shahar, Shahar demanded that Baines meet with her alone and Hampton enforced Shahar's demands.  (Doc. 253-3, Ex. 121; Doc. 265-14, 61-66.) As a result, Baines began taking sick leave from work. (Doc. 246-6.)

During this time, Shahar functioned as Baines's supervisor, directing Baines's work, and Baines never assigned Shahar work. (Doc. 297, 94:20-23, 95-97; Doc. 253-1, 351:12-15; Doc. 263-3, ¶ 6.) Shahar chastised Baines if Baines attempted to act without Shahar's approval. (Doc. 267-7, 12.)  As "the most senior attorney in the

[Law department]," Shahar was involved in policy making and "responsible for delegating assignments for [the Section 1983] project, previewing the work product, giving feedback." (Doc. 297, 15:2-16, 23:11-19, 24:23-26, 30:5-31, 47:5-13, 48-49:13-21, 50-52; Doc. 296, 33:20-25, 34; Doc. 265-14, 30-51.) Shahar supervised "individuals on projects," considered "training and leadership" of junior attorneys to be "two of [her] core responsibilities," and was consulted for feedback on recruiting and discipline. (*Id.*) Shahar also had policy making authority as the Mayor's Advisor on LGBT Issues, and "supported the Administration's analysis of and response to LGBT personnel issues." (Doc. 265-15, 52-54.) Shahar told Baines, who identifies as LGBT, that Shahar "was the City" with respect to LGBT employee issues; Baines understood Shahar's comment and the City's refusal to stop Shahar's harassment to mean Shahar had supervisory authority over Baines. (Doc. 253-1, 347:14-19, 349:4-8.)

## C.    Another City Attorney, Maiysha Rashad, sexually harasses Baines.

Baines was also simultaneously harassed by coworker, Rashad. While on a work trip in April 2016, Rashad inappropriately groped Baines *in front of Hampton* and later sexually assaulted Baines in her hotel room. (Doc. 253-1, 184:17-22, 374:23-375:30; Doc. 265-7.) Later. Rashad and Baines engaged in an ongoing mutual text exchange. (Doc. 264-3, ¶ 4, Ex. A.) Rashad told Baines that she wanted to come and watch her box, discussed her insomnia problems ("I have a hard time

sleeping too. I know you couldn't tell from DC. Lol."), invited Baines to her home in the middle of the night, and asked Baines – whose middle name is Nikki – if people sang Darling Nikki (a sexually-graphic song) to her. (Doc. 253-1; Doc. 264-3, ¶ 5, Ex. A.) Eventually, Baines submitted to Rashad's advances and asked Rashad on a date, which Rashad declined. (Doc. 256-2.) Baines then suggested they cease all future communications and assumed the issue was done. (*Id.*) However, Rashad began harassing and stalking Baines, which Baines also repeatedly reported to City officials. (Doc. 298, 136:15-21, 137; Doc. 265-15, Ex. 86.)

### D. The City repeatedly ignores Baines's complaints.

Despite Baines's repeated reports of sexual harassment to City officials throughout 2016 and 2017, the same City officials provided Shahar and Rashad with greater access to Baines. Baines reported Shahar's sexual harassment to Hampton on several occasions; to Deputy City Attorney Karen Thomas several times; to Commissioner of Human Resources Yvonne Yancy on December 6, 2016, and March 7 and 9, 2017; and to the City's outside counsel David Gevertz in March 2017. (Doc. 253-1, 247:22-248:7, 249:17-250:2, 251:2-6, 265:1-6.) Baines reported Rashad's harassment to Thomas and Gevertz throughout 2016 and reported Rashad's and Burnette's (another co-worker) continued stalking (detailed further below) to Yancy on December 6, 2016, and March 7 and 9, 2017. (Doc. 265-7; Doc. 267-7, 13-16.)

After Baines reported Rashad's assaults to Gevertz, who was retained by Hampton, Gevertz directed Baines not to speak about it or to characterize Rashad's conduct as inappropriate. (Doc. 265-7.) He imposed a no-contact order between Baines and Rashad; requiring that Rashad cease working on Section 1983 cases, in which Baines was heavily involved. (Doc. 256-1, 85:21-87; Doc. 292, 40:2-41.) Within a week, Hampton ignored this directive and assigned Rashad to a 1983 case, allowing Rashad to regularly attend meetings mere feet from Baines's office. (Doc. 292, 40:8-42:22.)

Rashad continued to stalk Baines with Burnette. (Doc. 253-1, 161:3-19, 226:24-227:7, Exs. 27, 36; Doc. 298, 58:25-60.) Rashad parked by Baines, looked inside Baines's car, hacked into Baines's social media accounts along with a friend, had a friend take pictures and videos of Baines, walked close behind Baines in the office, waited outside her own car until Baines was forced to walk by her, walked back and forth by Baines's office, and made false claims against Baines. (Doc. 253-1, 161:3-21; Doc. 253-8, Ex. 20, 1, 7-8; Doc. 263-3, Ex. B.)

Baines continued to report Shahar's, Rashad's, and Burnette's harassment to Thomas, Hampton, and Patrick. (Doc. 253-1, 247:22-248:7, 249:17-250:2, 251:2-6, 265:1-6.) Hampton, Thomas, and Patrick allowed Shahar and Rashad to repeatedly harass Baines with impunity. (Doc. 253-1, 258:1-259:2, 264:7-23.) Baines asked Hoffler to enter *Ruch* as additional counsel so Baines would not have to be alone

with Shahar. (Doc. 253-1, 252:12-24.) While working on *Ruch*, Hoffler witnessed Shahar pulling Baines's chair closer to her own, touching Baines's thigh with her whole palm, and touching Baines's shoulder and side. (Doc. 253-8, 84:2-17, 88:7-12, 91:3-97:5, 101:13-103:7.) After Hoffler told Shahar her behavior was inappropriate, Shahar removed Hoffler from the case. (Doc. 253-8, 92:12-22; Doc. 253-1, 339:23-340:11.) Shahar continued to exert her power over Baines by forcing the dismissal of an appeal in favor of Shahar's City's-endorsed strategy of inducing perjured testimony.  (Doc. 253-1, 294:5-295:18).

At no time did Hampton, Thomas, Patrick, Yancy, or Gevertz ever advise Baines of her rights under the City's Sexual Harassment Ordinance or take a written statement from her as required by the Ordinance. (Doc. 298, 29:24-32; Doc. 264-3, ¶¶ 20-22.) Rather, they silenced Baines, continued poisoning the office environment, and later punished Baines in violation of the Ordinance. (Doc. 295, pp. 36-37, 35:10-36:7; Doc. 298, 33:5-34, 53:15-56, Ex. 38; Doc. 292, 31:11-32.)

### E.    Baines rejects Shahar's quid pro quo proposition.

On December 6, 2016, nearly a year after Shahar's sexual harassment began, Human Resources summoned Baines. (Doc. 253-1, 300:1-7.) On Baines's way to HR, Shahar summoned Baines into her office, directing Baines to close the door. (Doc. 253-1, 231:5-13, 300:14-22.) Shahar admitted that Rashad and Burnette were inappropriately accessing Baines's social media accounts, setting her up for

8

discipline. (Doc. 253-1, 217:9-17; Doc. 264-3, Ex. A.) Shahar then told Baines she could "make it all go away." (Doc. 253-1, 342:2-4.) Baines asked what she would have to do to "make it all go away," and Shahar replied, "you know," meaning submitting to Shahar's sexual demands. (Doc. 253-1, 341:14-342:17.) Baines responded, "you people are fucking killing me," as Shahar's comment made clear that by not submitting to Shahar's advances, Baines was doomed to continue to suffer the escalation of severe and pervasive abuses by Shahar, Rashad, and Burnette. (Doc. 253-1, 301:14-302:20, 342:18.) Baines began to cry, had trouble breathing, and suffered a panic attack. (Doc. 253-1, 342:19-20.) Baines attempted to call her therapist, Dr. Torre Prothro-Wiley, but Shahar grabbed her phone, blocking Baines from speaking to Prothro-Wiley. (Doc. 253-1, 302:21-303:22, 342:20-21; Doc. 297, 139-140.)

After Baines left Shahar's office, Shahar pursued Baines to HR, physically blocking Baines from reporting Shahar's conduct, which HR acknowledged was "weird." (Doc. 253-1, 303:23-304:23, 343:1-20; Doc. 289, 61:22-63; Doc. 297, 143:2-146.) While in HR, Baines told Yancy that Shahar had been sexually harassing her and that Rashad and Burnette had been stalking and cyber-stalking her. (Doc. 253-1, 312:16-314:15; Doc. 289, 39:19-40, 66:20-67.) Hoffler confirmed Baines's account to Yancy. (Doc. 298, 196:6-197.)

**F.      After Shahar's quid pro quo proposition, Baines required FMLA.**

The day Shahar propositioned Baines following a year of severe harassment, Baines suffered a mental health crisis at work. (Doc. 253-1, 164:25-165:5, 230:19-24, 301:14-302:5, 316:10-16.) Dr. Adrienne Bradford, the City's Director of Employee Assistance, reported that Baines was "extremely distressed." (Doc. 298,66:14-67; Doc. 253-6, 26:10-29:7, 31:25-32:14.) Baines was taken to see Prothro-Wiley, who put Baines on a two-week medical leave. (Doc. 298 67:4-8; Doc. 253-7 44:7-45:19, 47:23-48:11; Doc. 253-1, 305:23-306:8, 308:11-16; Doc. 253-2, Exs. 19-24; Doc. 253-8, 120:18-23, Ex. 13.) Baines provided Prothro-Wiley's leave request to the City. (Doc. 253-8, Ex. 13.)

On December 16, 2016, Prothro Wiley extended, and the City approved, Baines's FMLA leave to January 26, 2017, determining that Baines could not "cognitively process [...] her legal cases due to stress, fatigue, insomnia, and acute anxiety" as she was suffering from "anxiety, depression, cognitive dissonance, and physical fatigue from her depression." (Doc. 253-7, 55:10-22, 59:8-60:5, Ex. 9; Doc. 298, 91, 90:13-17; Doc. 246-13.) Baines's FMLA was later approved through February 24, 2017 with a release to work of February 27, 2017 because, "at that time, Baines was not having flare-ups. She had started doing the coping mechanisms and skills [they] had discussed in the session . . . [S]he was seeing a psychiatrist and was actually taking medication, and she had said that she was ready to go back to

10

work." (Doc. 298, 96:19-98; Doc. 246-10; Doc. 246-15; Doc. 253-7, 87:14-25, Exs. 10, 11.) Prothro-Wiley recommended that Baines be returned to work on a reduced schedule for one month, which by this time the City had further poisoned by allowing Shahar and Rashad to enter her cases at first and Shahar to withdraw Baines from her cases. (Doc. 253-7, 64:21-65:10, Ex. 11.).

### G.    Yancy, Hampton, Patrick, and Shahar conspire with Gevertz to terminate Baines.

On December 6, after Baines reported the sexual and other harassment to Yancy, Hampton contacted outside "counsel" Gevertz to assist with the scheme to silence Baines.[1] (Doc. 292, 49:23-51.) After Hampton consulted Gevertz, Yancy met with Atlanta Police Officer Shaun Houston to gather ammunition against Baines with Shahar. (Doc. 267-12, 6-9.) During Houston's meeting, Shahar falsely claimed that "[Baines] stated she wanted to buy a gun and kill herself," and Shahar and Yancy knowingly falsely claimed Baines "was then taken directly across the street to DeKalb Medical (sic) hospital in an attempt to assist her with admittance for her current state," noting Baines was taking "medication for a mental condition." (*Id.*; Doc. 264-3, ¶ 10.) Shahar also repeated her lies in an email, which was later sent to

---

[1] Gevertz authored "Guns, Drugs and Crazy: What to do With an 'Erratic' Employee."
https://cdn.ymaws.com/www.shrmatlanta.org/resource/resmgr/25th_Conf_PPTs/Gevertz_David_PPT.pdf

11

Hampton, who was already aware of Shahar's history of lying.[2]

A week later, Hampton further poisoned the workplace by instructing Rashad to enter two of Baines's cases, while demanding that Baines remain on the case, despite Baines's reports and the no-contact order. (Doc. 264-2, ¶ 131; https://ecf.gand.uscourts.gov/doc1/05519549644; https://ecf.gand.uscourts.gov/cgi-bin/iquery.pl?98102298274184-L_1_0-1, 26.) And Hampton, Patrick, and Shahar directed Baines to perform substantive work during Baines's FMLA leave, insisting she remain in the workplace. (Doc. 253-8, 173:5-17, 175:1-18, 241:23-242:5, 252:5-20, 259:20-260:1; Doc. 253-1, 358:3-12, 361:4-16; Doc. 264-3, ¶ 16; Doc. 264-4, ¶ 8.) Shahar, further empowered by Hampton and Patrick's refusal to stop her after Baines's breakdown and Gevertz's involvement in silencing Baines, entered as lead counsel on another of Baines's cases (*Ruch*), thereby demoting her. (Doc. 265-14, 55-57.)

On January 17, 2017, the City printed the police report for the FFD. (Doc. 221-12, 42.) The next day, Shahar – despite Hampton's directive that Baines remain on the cases and the standard office practice of filing a leave of absence for employees on temporary leave – began withdrawing Baines from the cases Shahar

---

[2] In October 2016, the City learned Shahar lied to the police about her identity impersonating a coworker at the airport and induced a client to commit perjury. (Doc. 295, 131:10-132; Doc. 253-8, 392-393.).

entered. (Doc. 265-14, 61-72; Doc. 267-17, Exs. 12, 13.) The City continued to force Baines to work in violation of FMLA, including on the cases Rashad and Shahar had entered. (Doc. 253-8, 173:5-17, 175:1-18, 241:23-242:5, 252:5-20, 259:20-260:1; Doc. 253-1, 358:3-12, 361:4-16; Doc. 264-3, ¶ 16; Doc. 264-4, ¶ 8.) On February 23, 2017, Baines contacted Patrick – now her supervisor – for assistance with the work she was assigned while on FMLA. (Doc. 246-11.) Patrick forwarded Baines's email to Gevertz, copying Hampton. (*Id.*) Gevertz characterized Baines's request for help as evidence of Baines's "continued interpersonal issues" and suggested the City use her email as "ammunition" to further Yancy's goal of terminating Baines. (Doc. 298, 120:19-121; Doc. 246-11.)

The following day, Yancy refused to reinstate Baines to her SACA position, placed her on administrative leave, and required her to submit to an FFD. (Doc. 298, 122:2-123, 214:11-215; Doc. 246-12; Doc. 296, 132:17-133; Doc. 295, 121:24-125, 139:1-140.) However, Bradford did not believe Baines needed an FFD, recommending the City follow up with Prothro-Wiley. (Doc. 253-6, 60:5-8, 83:24-85:13.) The City disregarded Bradford's recommendation[3] and proceeded with the sham FFD exam to obtain "ammunition" to terminate Baines; and Yancy emailed Patrick and Gevertz to request a summary of Baines's "workplace interactions" for

---

[3] Yancy's excuse for not consulting Prothro-Wiley was that Prothro-Wiley used to be a hairdresser. The City also did not consult with Baines's psychiatrist, Dr. Marks, despite Prothro-Wiley stating she conferred with Marks before releasing Baines.

the FFD.  (Doc. 292, 61:6-62; Doc. 253-6, 60:5-8, 84:7-85:13; Doc. 298, 127:24-133; Doc. 265-15, 135.)

On March 3, 2017, Baines filed a Charge of Discrimination with the Equal Employment Opportunity Commission reporting that she "believe[s] [she] was discriminated [against] in violation of the [ADA], and Title VII []," and that "harassment at the workplace trigger[ed] effects of [her] disability." (Doc. 249-1, 9.) Baines sent two letters following up on her December 6, 2016 sexual harassment reports to Yancy. (Doc. 295, 159:10-160, 170:22-172).

On March 16, 2017, Gevertz sent a letter to Baines, claiming he was retained to investigate Baines's "hostile work environment claim," inviting her to discuss her claim with him. (Doc. 298, 148:12-151; Doc. 253-1, 334:2-336:5.) Baines left Gevertz a voicemail, which he forwarded to Hampton and Yancy, explaining the "hostile work environment," including Shahar's harassment and the City's requirement that she "work with and meet alone with somebody who [she] felt was being inappropriate and who [she] didn't feel comfortable being around," all of which led to her December 6 breakdown. (Doc. 295, 182:18-184, 189:6-190; Doc. 298, 148:12-151; Doc. 253-1, 334:2-336:5.)

Rather than return Baines's call, between March 17 and March 22, 2017, Gevertz interviewed Hoffler, Shahar, Patrick, Jones, and Alicia Hickman. (Doc. 295, 196:23-201.) Hoffler told Gevertz she witnessed Shahar, Rashad, and Burnette's

14

harassment of Baines and the City forcing Baines to work while on FMLA. (Doc. 264-4, ¶¶ 13-15.) Gevertz failed to interview Rashad or Burnette regarding Baines's allegations during his "investigation" or even call Baines. (Doc. 295, 196:23-198.) Shahar later lied about meeting with Gevertz. (Doc. 297, 206:18-207.)

After Gevertz met with Shahar and Patrick, the City provided Dr. Ifetayo Ojelade, a psychologist selected by the City to conduct the sham FFD used to terminate Baines, as evidence of Baines's "workplace interactions" documents including (1) Rashad's memo falsely accusing Baines of stalking;[4] (2) the police report containing Shahar's lie about the gun, which the City knew was false; (3) the "ammunition" email; and (4) long-rescinded discipline against Baines. (Doc. 298, 187:11-188, 190:17-191:14-194; Doc. 253-4, 110:25-111:11, 112:13-18; Doc. 253-5, Exs. 23, 25, p. 2; Doc. 267-17, 59-60; Doc. 246-11.) But the City failed to provide Ojelade with Baines's job description, despite it being hard to "determin[e] if someone could do a job if they didn't have the job [description]." (Doc. 298, 128:7-129; Doc. 265-15, 135.).

### H.    Following the sham FFD, the City terminated Baines.

During an over five-hour abusive FFD, Ojelade had Baines sign a HIPPA

---

[4] Hampton directed Rashad to prepare this memo on April 4, 2017 *after* Baines's meeting with Ojelade. (Doc. 256-1, 59:16-60:6.) The memo contained confirmation of Rashad's repeated violations of the no-contact order and allegations against Baines the City knew or should have known were false.

release under the guise of providing information to Prothro-Wiley about the FFD, but she used the release to get information from Prothro-Wiley confirming Baines's bipolar diagnosis only.[5] Then, after Prothro-Wiley confirmed Baines's reports of sexual harassment and Baines's bipolar disorder diagnosis, Ojelade diagnosed Baines with Post Traumatic Stress Disorder ("PTSD") and found Baines fit to return to work, but claimed that "Baines[] is deemed not fit to return to her current work environment … Given that she would be returning to the same environment, she is likely to continue displaying a similar pattern of behavior resulting in further decompensation and continued psychological distress. This is not to suggest that the examinee is unfit to function as an attorney, but rather she does not possess the psychological resources to function optimally in her current work environment." (Doc. 253-4. 86:14-87:12; Doc. 253-5, Ex. 34; Doc. 298, 172:4-173.)

Baines sought a second opinion from Dr. Mark Ackerman as permitted by the City's Ordinance. Before the evaluation, Bradford told Baines that if the independent evaluation cleared Baines, the City would require Baines to endure another evaluation – making clear the City's objective to terminate Baines. (Doc. 290, 59:23-60; Doc. 267-8.) After Ackerman's evaluation but before clearing Baines, Ackerman told Baines "he had advised the City that he planned to clear [her]

---

[5] Ojelade only sought confirmation of the diagnosis, not whether Baines was compliant with her medication.

to return to work." (Doc. 253-1, 377:3-7.) A day or two later, Gevertz demanded Baines contact him within 24 hours under the guise of investigating an allegation Baines handled a private legal matter in violation of a policy. (Doc. 264-5, Ex. 66.)[6] The next day, after consulting with Gevertz and relying on his advice, Berry terminated Baines. (Doc. 291, 44:3-45, 76:18-78, 82:7-86.) A month after terminating Baines, the City amended its FFD policy to remove the independent opinion requirement for mental health exams, thereby eliminating any obstacle to the City's use of a sham FFD process to terminate employees with mental illness. (Doc. 294, 20:4-21.)

Four months after her termination, Baines amended her EEOC Charge, reasserting "sexual harassment, disability discrimination, and retaliation" as the hostile work environment had finally ended with her July 2017 termination. (Doc. 249-1, 10.) In the City's position statement to the EEOC, Gevertz falsely claimed that (1) Baines told Shahar "she wanted to go buy a gun and kill herself,"; (2) Baines was acting "erratically" in the months leading up to her breakdown; and (3) Baines was harassing Rashad due to her mental illness. (Doc. 249-1, 12-13.) Gevertz failed to mention Baines's repeated sexual harassment complaints, his efforts to silence Baines's complaints about Rashad in June 2016, that he had supposedly been

---

[6] The City claimed that in July 2017, Patrick notified City Attorney Jeremy Berry that she received a letter (which was dated August 2017) from counsel alleging Baines handled a private legal matter. (Doc. 296, 41:13-42, 147:20-148.)

17

retained to investigate Baines's "hostile work environment claim," or the scheme – and his complicity in the scheme – to terminate Baines. (*Id.*) As "proof," Gevertz attached the police report and Rashad's memo, accusing Baines of wrongdoing dating back to the same June 2016 period that Gevertz had silenced Baines. (Doc. 221-12.) The Position Statement states nowhere that Baines allegedly made a suicide threat to anyone except Shahar. (*Id.*)

Shahar, Rashad, and Burnette were never investigated, forced to submit to FFDs or disciplined. (Doc. 297, 12:6-13, 204:5-207; Doc. 298, 153:12-154, 174:13-175.) After Baines filed this lawsuit, Shahar "retire[d]" (February 2019), Burnette "resign[ed]" with no employment prospects (January 2019), and Rashad was terminated. (Doc. 282-1, 10:2-19; Doc. 256-1, 5:16-6:8.7; Doc. 297, 90:12-92.)[7] Still, the City has defended and exonerated Baines's harassers and continues to target Baines in furtherance of the City's policy or practice of sexual harassment.

## II.  Course of Proceedings and Disposition Below

Baines filed suit alleging (1) sexual harassment (hostile work environment and tangible employment action) against the City and Shahar under 42 U.S.C. § 1983, the Equal Protection Clause, and against the City under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (2) failure

---

[7] Hampton was City attorney until May 2017 but remained until August 2017, and Yancy remained as HR Commissioner until December 2017.

to accommodate and discrimination under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. § 12101 *et seq.*; (3) interference and retaliation under the Family and Medical Leave Act ("FMLA"), 28 U.S.C. § 2601 *et seq.*; and (4) retaliation under Title VII and the ADA. (Docs. 1, 48). The District Court granted summary judgment in favor of Shahar and in favor of the City on all claims except one of Baines's FMLA interference claims (which the parties later settled). (Docs. 320, 344, 358, 359.) The Magistrate Judge sustained Defendants' privilege objection to the production of certain documents and denied Baines's motion for sanctions regarding an *ex parte* meeting between Defendants' counsel and her therapist. (Docs. 199, 280, 348.)

## III.  <u>Standard of Review</u>

This Court reviews a summary judgment decision de novo, "viewing all facts and drawing all inferences in the light most favorable to" Baines. *Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1278 n.3 (11th Cir. 2021); *Tolan v. Cotton*, 527 U.S. 650, 651-52 (2014) (cleaned up). The Court may not "weigh conflicting evidence or determine the credibility of witnesses." *A.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018). In employment cases, a plaintiff "will always survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *Tynes v. Fla. Dept of Juvenile*

*Justice*, No. 21-13245, 2023 U.S. App. LEXIS 32836, at *12-13 (11th Cir. Dec. 12, 2023). If the record presents any genuine material dispute of fact, the Court must deny summary judgment and proceed to trial on that issue. *A.L.*, 900 F.3d at 1289.

This Court reviews rulings on discovery motions for clear error. *Fuentes v. Classica Cruise Operator Ltd.*, 32 F.4th 1311, 1321 (11th Cir. 2022).

<u>**SUMMARY OF ARGUMENT**</u>

The District Court erred in granting summary judgment to Shahar, ignoring substantial evidence Shahar created a hostile work environment and subjected Baines to tangible employment actions because Baines rejected her sexual advances through July 2017 and rejecting that the statute-of-limitations was tolled by Baines's mental health condition. The District Court also erred in granting summary judgment to the City because: (1) the City conspired to violate Baines's constitutional rights and was deliberately indifferent to Baines's constitutional rights when it refused to protect Baines from the hostile working environment and took tangible employment actions against Baines for reporting and rejecting the hostile work environment; (2) Baines exhausted her administrative remedies under Title VII relating to her sexual harassment claims; (3) the City failed to accommodate and discriminated against Baines under the ADA where it used a sham FFD to terminate Baines; (4) the City interfered with Baines's FMLA rights when it refused to reinstate her to her SACA position and instead forced her to submit to a sham FFD; and (5) the City retaliated

20

against Baines in violation of the FMLA, ADA, and Title VII, by subjecting her to a pretextual FFD and terminating her employment after seeking ammunition for Baines's termination. Finally, the District Court erred in granting summary judgment to Defendants when Baines is entitled to certain of the City's emails and in its refusal to sanction Defendants' counsel.

## ARGUMENT

The District Court ignored the summary judgment standard, improperly made credibility determinations, and made inferences in the City's and Shahar's favor while discounting evidence in Baines's favor. When the evidence is viewed in the light most favorable to Baines, it shows that Defendants subjected Baines to a hostile work environment and tangible employment action sexual harassment, forced Baines to submit to a sham FFD when she rejected Shahar's sexual advances, refused to return her to her SACA position following her medical leave, and ultimately terminated her employment in violation of 42 U.S.C. § 1983, Title VII, the ADA and the FMLA. Thus, this Court should reverse the District Court's dismissal of Baines's claims and remand for further proceedings.

## IV.    Baines's Sexual Harassment Claims were Improperly Dismissed.

### A.    *Shahar cannot escape the consequences of her harassment extending through 2017.*

The lower court erred in concluding the statute of limitations lapsed on Baines's claims against Shahar, because Shahar perpetuated the hostile work

21

environment and tangible employment actions against Baines until Baines was terminated in July 2017. Sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under 42 U.S.C. § 1983. *Cross v. State of Ala.*, 49 F.3d 1490, 1507 (11th Cir. 1995). Baines has both hostile work environment and tangible employment action sexual harassment claims against Shahar because Shahar subjected Baines to a hostile work environment and was the driving force behind the tangible employment actions Baines suffered in February, March, and July 2017.

Multiple decision-makers used Shahar's lie about Baines owning or buying a gun as ammunition to fire Baines. Shahar created this fiction after Baines repeatedly reported Shahar's sexual harassment of her and after Shahar's two failed attempts to physically prevent Baines from reporting Shahar's harassment further, and she perpetuated it throughout 2017 to ensure Baines did not return to the Law Department. (Doc. 267-12, 6-9.) Shahar's lie was so inflammatory that it triggered the City's discriminatory animus and was the driving force behind the City refusing to reinstate Baines on February 24, 2017; forcing her to undergo the sham FFD on March 28, 2017; and Ojelade determining that Baines was not fit to return to "her current work environment" – the Law Department. Shahar never corrected her lie about Baines, despite knowing Baines was facing tangible employment actions because of the lie and multiple chances to come clean before Baines was terminated

22

in July 2017. *See Jackson-Hall v. Moss Point Sch. Dist.*, 2012 U.S. Dist. LEXIS 45947, *4-5, 8-9 (S.D. MS. Apr. 2, 2012) (a claim does not accrue until there is a tangible employment action – here on February 24, 2017 and again in July 2017); *Nolen v. S. Bend Pub. Transp. Corp.*, 99 F. Supp. 21d 953, 961 (N.D. Ind. 2000) ("Nolen's termination is well within the required time for his EEOC filing. This act may be linked to the prior 'discrete' acts for the purpose of evaluating whether Nolen was subjected to quid pro quo harassment.").

Almost immediately after Baines rejected her sexual advances in December 2017 and her promise to "make it all go away" if Baines would submit to her sexual advances, Shahar continued her threatening and harassing conduct. Shahar withdrew Baines from some of her cases beginning January 18, 2018, the day after the police report containing Shahar's lies was printed for the FFD and continuing through February 2017. Shahar also continued to force Baines to perform substantive work while on medical leave for fear of being terminated if she did not follow Sharar's directives. In these ways, Shahar continued to exert control over Baines's employment for rejecting Shahar's advances.

While the lower court concluded that the only action that Shahar undertook after December 6, 2016, was withdrawing Baines from cases, which the court deemed "routine," the court ignored the fact that Shahar's withdrawals were done despite Hampton's directive that Baines remain on the cases and these actions were

not routine at the City for employees on temporary leave. The court further ignored the impact that Shahar's lie had in perpetuating the hostile work environment. Indeed, Shahar knew that such a lie about an employee taking "mental health pills" would inflame the City's prejudices.

In sum, Shahar exacerbated Baines's mental health issues by forcing Baines to defend herself against spurious claims she had a gun because Baines rejected Shahar's sexual advances. Shahar continued to target Baines until Baines's termination in July 2017, which a jury can certainly find is evidence of Shahar's continued role in creating a hostile work environment for Baines and influencing the tangible employment actions against Baines. *See Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) ("numerous allegations of harassment constitute an allegation of one unlawful employment practice … the entire time period of the harassment may be considered for the purposes of determining liability"); *AMTRAK v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts … It occurs over a series of days or perhaps years … Such claims are based on the cumulative affect of individual acts."); *Parks v. City of Warner Robins*, 841 F. Supp. 1205, 1209 (M.D. Ga. 1994) (holding an employee's statute of limitations had not run where "the threat of termination" remained).

The Court also improperly held that Baines was not a part of the work environment while she was on FMLA leave and paid administrative. (Doc. 320, pp.

24

6-7.)  Indeed, the Court relied on *Stewart v. Jones Util. & Contr. Co.*, despite the fact it holds that a sexually hostile work environment only ends when an employee is terminated and, thus, the employee was no longer threatened with the loss of her job._806 Fed. Appx. 738, 742 (11th Cir. 2020). Here, Baines remained in the workplace – due largely to Shahar's own actions – until her termination in July 2017. (Doc. 253-8, 167:10-21, 173:5-17, 175:1-18, 241:23-242:5, 252:5-20, 259:20-260:1; Doc. 263-4, ¶¶ 7, 8; Doc. 253-1, 358:3-12, 361:4-16; Doc. 264-3, ¶ 16; Doc. 296, 72:5-73:2; Doc. 257-1.)

## B. *Under the totality of the circumstances, Shahar's harassment was severe and pervasive.*

The lower court mistakenly analyzed Baines's sexual harassment claim under the "severe or pervasive" standard, because Baines asserted tangible employment action claims, which do not require her to demonstrate that the harassment was severe or pervasive. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 753-54 (1998). Nonetheless, even applying the severe or pervasive standard, Baines made the threshold showing as "the evidence of harassment is considered both cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). "As the Supreme Court has observed, '[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a

simple recitation of the words used or the physical acts performed.'" *Id.* at 810 (citing *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81-82 (1988)).

Shahar sexually harassed Baines for over a year and a half, repeatedly touching Baines and following through on threats in January, February, March, and July 2017. Indeed, it was because of Shahar's lies that Baines was forced to undergo an abusive FFD process and ultimately terminated. A jury can find that Shahar's harassment – which continued unabated until Baines's termination in July 2017 – was objectively severe (as Ojelade found when she diagnosed Baines with PTSD) and subjectively severe due to the psychological toll it had on Baines based on the totality of the conduct.

As such, the lower court erred in dismissing Baines's 42 U.S.C. § 1983 claim against Shahar.

**C.**   ***The statute of limitations was tolled.***

Baines's claims against Shahar are also timely because the statute of limitations was tolled during the pendency of her mental health crisis caused in large part by Shahar's harassment. "[F]ederal courts must employ the applicable state statute of limitations in section 1983 cases … [and] give a section 1983 plaintiff the benefit of any toll effected by h[er] compliance with a state exhaustion requirement." *Lawson v. Glover*, 957 F.2d 801, 806 (11th Cir. 1987). Equitable tolling applies here because Baines suffered a mental health crisis on December 6, 2016 resulting in

cognitive dissonance. (Doc. 298; Doc. 253-5, Ex. 20, p. 3.) Baines was not released to return to work by her doctor until February 27, 2017. And O.C.G.A.§ 9-3-90 "provides a tolling of the statute of limitations for 'persons who are legally incompetent because of … mental illness' for so long as their disability persists." *Lawson*, 957 F.2d at 805. In determining mental incapacity, the courts ask, "whether the individual, being of unsound mind, could not manage the ordinary affairs of h[er] life." *Id.* (cleaned up.) Baines was on FMLA leave until February 27, 2017 due to her inability to cognitively process—in other words, Baines was of "unsound mind" and unable to work until February 27, 2017. Thus, the statute of limitations was equitably tolled at least until February 27, 2017.

### D.   *The City is liable under Monell.*

Despite the City's failure to investigate Baines repeated complaints and admission in every pleading filed in this case that it used Baines's mental illness to exonerate Shahar and Rashad and condemn Baines of the unreported harassment of Rashad without investigating, the lower Court dismissed Baines Section 1983 claim. The Court relied on the mere existence of the City's sexual harassment policy despite the City's failure to train on or administer the policy. Adopting a sexual harassment policy alone is insufficient to avoid municipal liability, especially when the City's highest decisionmakers – including Hampton, Berry, Yancy, and Gevertz – conspired to cover up and advance sexual harassment and stalking. (Doc. 320, 7-8.)

27

Under *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978), the City is liable for constitutional violations resulting from: (1) an official government policy; (2) a custom or practice so pervasive and settled it assumes the force of law; or (3) the actions of an official fairly deemed to represent governmental policy. A "municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy [under *Monell*] 'if the municipality tacitly authorizes these actions or displays deliberate indifference'." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (cleaned up). None of the high-ranking individuals to whom Baines complained advised her of her rights, interviewed her, or took a written statement from her regarding her complaints as required by the City's Sexual Harassment Ordinance.[8] Instead, Hampton, Yancy, and Gevertz sought to silence and terminate Baines.

A policy may also be inferred from circumstantial evidence that a municipality displayed a deliberate indifference to the constitutional rights of an individual by its repeated failure to make any meaningful investigation into multiple complaints of constitutional violations after receiving notice. *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1408 (S.D. Fla. 2014). Even if there existed no evidence of the City's scheme, Baines presented substantial evidence that both the

---

[8] The court also ignored Yancy's admission that, by failing initiate an investigation of Baines' complaints, Hampton violated the City's policy. (Doc. 298, 54-55.)

28

City's top Legal and Human Resource Commissioners – obligated by the City Code to enforce the City's Ordinance – displayed such deliberate indifference by failing to investigate Baines's repeated complaints and participating in a scheme with Baines's harassers to silence Baines about the harassment. Such evidence can establish a City had an informal policy or custom under *Monell*. *See, e.g.*, *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496 (11th Cir. 1986) (city's knowledge of prior complaints, failure to take remedial action, and failure to remedy pattern of known constitutional violations is precisely the type of informal policy or custom actionable under 1983); *Griffin*, 261 F. 3d at 1311 (finding liability when sexual harassment was ongoing, accepted practice and known to high ranking City officials who ignored and tolerated it). A jury could easily find that the City actively covered up and aided Shahar's and Rashad's harassment. Thus, the lower court's ruling should be reversed.

The District Court also erred due to the City's admissions of a policy or practice of sex discrimination. In *judicio* admissions of counsel are admissible against their client. *Pullman Co. v. Bullard*, 44 F.2d 347 (5th Cir. 1930); *Rahn v. Olens*, No. 1:14-CV-3660, 2015 U.S. Dist. LEXIS 103516, 2015 WL 4717448 (N.D. Ga. Aug. 7, 2015); and *Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618 (11th Cir. 1983). Here, the District Court ignored the admissions made by the City's former and current counsel in every pleading filed below, that

the City exonerated Shahar, Rashad, and Burnette without any investigation and blamed Baines based solely on Baines's mental health condition. These admissions show that the City's actions (or inaction) were not a "one-off," but part of a policy or practice.

Further, under Atlanta City Code Section 2-783(f), the City is prohibited from defending a former or current employee whose acts (1) did not arise out of their employment or is unreasonably related to such employee; (2) constitute an actual or intentional misconduct; or (3) conflict with the City's interests. Here, the City actually enlisted Gevertz's assistance to silence Baines, beginning as early as June 2016.[9] The City also provided counsel (Gevertz) to Shahar, and its counsel continues to defend Shahar, Rashad, and Burnette at depositions. The fact that the City had and continues to retain outside counsel (especially Gevertz who played such a pivotal role in the scheme) to defend the perpetrators who mercilessly harassed and stalked Baines is sufficient evidence for jury to conclude that their conduct arose out of their employment with the City and consistent with the City's policy.

A jury can also conclude that this City policy – whether created by the City's overt scheme or its deliberate indifference – and use of outside counsel (Gevertz) to

---

[9] In a June 13, 2016 email between Gevertz and Rashad's personal email, Rashad responds with to a later-deleted request from Gevertz with "Will do!:)" (Doc. 256-1, 164.) After Gevertz's involvement, Shahar's, Rashad's, and Burnette's sexual and other harassment escalated until Baines's eventual termination July 2017.

assist with its scheme was the moving force behind the escalated sexual harassment, including the City's use of a sham FFD to silence Baines, as the City and Baines's sexual harassers realized they could abuse Baines with impunity.

For these reasons, the lower court erred in granting summary judgment on Baines's Section 1983 claim against the City.

### E.  *Baines exhausted her administrative remedies.*

The District Court improperly overruled the R&R's conclusion that Baines sufficiently exhausted her administrative remedies under Title VII (Doc. 299, 35-36; Doc. 320, 2-6), relying on nonprecedential case law despite binding circuit precedent compelling the opposite conclusion.[10] (*Compare Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970) (allowing national origin discrimination charge to relate back to date of sex discrimination charge because "a charging party's failure to attach the correct legal conclusion to the factual allegations contained in a charge of discrimination is a mere technical defect") *with Fairchild v. Forma Sci.*, 147 F.3d 567, 575 (7th Cir. 1998)).

The District Court initially erred since the clock did not start on Baines's EEOC charge until the final tangible employment action arising from the sexual harassment – Baines's termination in July 2017. However, even using the earlier

---

[10] Reliance on *Ortiz v. Waste Mgmt., Inc.*, 808 Fed. Appx. 1010 (11th Cir. 2020) for a contrary conclusion is likewise inapposite because *Ortiz* did not analyze amendments to EEOC charges at all.

date, the District Court erred, because the City and EEOC were on notice of Baines's Title VII sexual harassment claim and Baines exhausted her administrative remedies. In fact, the City sought to silence Baines, because of its knowledge of Baines's repeated complaints. Then days after Baines's March 3, 2017 *pro se* EEOC charge stating the workplace harassment triggered her disability and that she believed she was being discriminated against under Title VII, Baines reported the sexual harassment again to Yancy, who shared it with Hampton and Gevertz. The following week, Gevertz falsely alleged that he would "investigate" Baines's complaints of sexual harassment.

After the City terminated Baines on July 18, 2017, Baines amended her EEOC Charge on November 3, 2017, well within the 180-day deadline for tangible adverse employment actions she suffered because of rejecting Shahar's advances. Baines's Charge stated that her concerns included "sexual harassment" and further noted that the harassment was ongoing as Rashad and Burnette were still stalking her. The EEOC investigation ensued after the City responded in 2018, and the right to sue was issued later that year. (Doc. 221-12.)

The District Court should have found that Baines's complaint began on July 17, 2017 or, in the alternative, related back to her March 2017 EEOC complaint because "[t]he proper inquiry [regarding the scope of an EEOC charge] … is whether [the] complaint was like or related to, or grew out of, the allegations contained in

[the] EEOC charge." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004). And "[t]he court must keep in mind that the purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer. Good faith effort by the employee to cooperate with the agency and EEOC to provide all relevant, available information is all that exhaustion requires." *Wade v. Sec'y of Army*, 796 F.2d 1369, 1377 (11th Cir. 1986) (cleaned up). "Once a charge is filed, a petitioner may amend a charge to clarify and/or amplify the allegations made therein. Amendments that allege additional acts that constitute unlawful employment actions related to or growing out of the subject matter of the original charge relate back to the date the charge was first received." *Kelly v. Dun & Bradstreet Corp.*, 457 Fed. Appx. 804, 805 (11th Cir. Dec. 5, 2011) (citing 29 C.F.R. §§ 1601.12(b), 1626.8(c)). The claim Baines alleges here, sexual harassment (hostile work environment and tangible employment action), was related to and grew out of her March 3, 2017 charge. Thus, her November 2017 amended charge relates back.

Here, both the EEOC and the City were on notice that Baines was sexually harassed. *Sanchez*, 431 F.2d at 462-467; *Gregory*, 355 F.3d at 1280; *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1225 n.36 (11th Cir. 2000). The lower court's reference to the City's Position Statement, authored by Gevertz, as proof the City lacked knowledge is also without merit, given the Court's acknowledgement of

Gevertz's role in the conspiracy, and Baines amended her charge well before the City's position statement was filed.[11] As such, Baines exhausted her administrative remedies and summary judgment should have been denied.

## V.    Baines's ADA claim was improperly dismissed.

### A.    *The City failed to accommodate Baines.*

To establish a prima facie case of discrimination under the ADA, Baines must establish that: (1) she is disabled; (2) she was a "qualified individual" at the relevant time, meaning she could perform the essential functions of her job with or without reasonable accommodation; and (3) she was unlawfully discriminated against because of her disability, or the City failed to accommodate her disability. *See Hollingsworth v. O'Reilly Auto. Stores, Inc.*, No. 4:13-CV-01623-KOB, 2015 U.S. Dist. LEXIS 10956, at *13-14 (N.D. Ala. Jan. 30, 2015) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)).

It is undisputed that Baines is disabled under the ADA. (Doc. 299, 76.) The lower court also properly concluded that working full time was not an essential function of Baines' employment and that Baines was a qualified individual under the ADA. (Doc. 299, 45-47.) The court erred, however, in concluding that the City accommodated Baines, despite evidence that the City violated Baines's FMLA

---

[11] The lower court could have tolled the statute of limitations due to Baines's disability.

rights. (Doc. 320, 7.) When Baines was released to return to work by Prothro-Wiley, Prothro-Wiley recommended that she work reduced hours – 15-25 per week – until her next assessment. (Doc. 246-10.) The R&R correctly noted, Prothro-Wiley's suggestion "that the City allow Plaintiff to come back half-time on a provisional basis for a month … may have been a potentially reasonable solution." (Doc. 299, 47-48.) But the lower court improperly concluded that the City offered an accommodation when it "continued Plaintiff on paid administrative leave to allow further recovery and/or give Plaintiff an opportunity to demonstrate recovery in the form of a fitness-for-work clearance, and alternatively also offered to facilitate applications for job transfer." (Doc. 299, 47-48.) The Court ignored evidence showing that the only purpose of placing Baines on administrative leave was to terminate her, not to allow for further recovery. Rather, the City sought to prevent Baines's recovery by forcing her to remain in the poisoned workplace and requiring her to pass a FFD with which the City intentionally interfered. (Doc. 246-2 ¶¶ 165, 166.) The City did not accommodate Baines and, as the City did not attempt to argue undue burden, the lower court should be reversed regarding Baines's failure to accommodate claim.

### B.    *The Lower Court's reliance on Todd is misplaced.*

An employee establishes the third element of a prima facie disability discrimination claim by showing the employer took an adverse action against her

because of her disability. 42 U.S.C. § 12112(b)(1) and (5). Here, the City's requirement that Baines undergo the FFD violated the ADA because the exam was not job-related nor consistent with business necessity. *See* 42 U.S.C. § 12112(d)(4)(a). To show an exam is required by business necessity, an employer must have objective evidence that an employee will be impaired by or will pose a direct threat because of a medical condition. *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013). The City failed to meet its burden of establishing this affirmative defense.

The lower court relied heavily on *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203 (11th Cir. May 27, 2021) in concluding that Baines was not a qualified individual because the Court's reliance on *Todd* is misplaced. In *Todd*, 998 F.3d 1203, this Court found that the school district, which was not complicit in an employee's mental breakdown and had a good faith belief the employee was a safety threat. While Todd denied making any threats, she could point to no discriminatory animus by the individuals alleging she made them or by the school. In contrast, this case is wrought with evidence of discriminatory animus by Gevertz, Yancy, Hampton, and Patrick.

While the lower court found evidence of discriminatory animus by Gevertz, Hampton, and Shahar, it made improper credibility determinations regarding Yancy's clear animus. The Court ignored Yancy's lies and the animus evident on

the face of the police report, attempting to paint Baines as erratic because she may be taking mental health pills, her repeated violations of City's policy, and her pivotal role in seeking "ammunition" to terminate Baines. Yancy explicitly directed Patrick and Gevertz to send her "documentation concerning Ms. Baines in the workplace" to the FFD examiner. On April 3, 2017, after the FFD, Yancy asked Patrick "why didn't the package [sent to Ojelade for Baines's FFD] include any data concerning [] Gevertz's investigation and the allegation [against Baines] of stalking?," despite knowing that providing such documents would completely taint the FFD process and violate the City's policy. And Yancy made no mention of any alleged threats until this lawsuit despite serving as HR Commissioner until December 2017. Yancy's justification for requiring Baines alone to undergo a FFD was also nonsensical: namely, Yancy's claims she was concerned Baines violated the no-contact order when there was no such evidence until Rashad manufactured it on April 4, 2017 after the FFD and there was extensive evidence that Hampton and Rashad were the ones repeatedly violating the no-contact order.

Thus, the court erred in concluding that Yancy harbored no animus toward Baines and that her testimony was credible.[12] The court also erred in its reliance on *Todd* and should be reversed on Baines's disability discrimination claim.

---

[12] The City did not act in good faith when Hampton and Yancy took the word a known liar accused of sexual harassment, especially given HR's observations of Shahar's "weird" behavior. The court also ignored that the police report shows that Yancy's

## VI.    Baines's FMLA Interference Claim

### A.    *The City failed to reinstate and accommodate Baines.*

The lower court incorrectly interpreted Baines's request to return to her office on a part-time basis for a limited time as a need for permanent accommodation and a bar to her right to reinstatement. In so doing, the court ignored the circumstances surrounding Baines's temporary request and that it resulted from the City's continued efforts to endorse the harassment. The lower court also ignored that the City's stated reason for its refusal was contradicted by the City's efforts to force Baines to work while on FMLA and Baines had leave remaining that could have covered the reduced hours until she was released to work full-time. (Docs. 299, 70-72; Doc. 269, 6.)

The court relied on 29 C.F.R. § 825.702(c)(4) for the proposition that if an employee requires an ADA accommodation to return to her previous position, she is not entitled to reinstatement under the FMLA. However, 29 C.F.R. § 825.702(c)(4) requires an employer to first reinstate an employee at the end of the FMLA period, which the City failed to do. 29 C.F.R. § 825.702(c)(4). Baines's requested temporary accommodation of reduced hours does not negate the City's fundamental duty to reinstate her under the FMLA, because working from 8:30 to 5:30 was never an

---

bias was due to her belief that Baines was compliant with her medication – not that she was off her medication.

"essential function" of her position.[13] The SACA job description lists nothing in its "Essential Duties and Responsibilities" section that could reasonably be read to require full-time physical presence in office. (Doc. 296, Ex. 61.) There is no evidence that Baines was required to be in the office full-time. Thus, this Court should reverse the lower court's conclusion that the City had no duty to reinstate Baines to a part-time version of her previous position.

**B.**    ***The City committed other FMLA violations.***

The District Court also erred in ignoring the City's failure to request that Baines provide a certification that she could perform all essential functions of her job. An employer requesting a return-to-work certification under the FMLA may either require a certification from the healthcare provider that (1) certifies that the employee is able to resume work or (2) "specifically address[es] the employee's ability to perform the essential functions of the employee's job." *Dykstra v. Fla. Foreclosure Attys., PLLC*, 183 F. Supp. 3d 1222, 1225-26 (S.D. Fla. 2016) (citing 29 C.F.R. § 825.312(b), (e)). To require an essential functions fit-for-duty release, an employer "must provide an employee with a list of the essential functions of the employee's job no later than with the designation notice" and "must indicate in the

---

[13] The court's conclusion that Baines could not perform the essential functions of her job under the FMLA but could under the ADA must be resolved in favor of the latter conclusion. (Doc. 299. 45-46, 74.)

designation notice that the certification must address the employee's ability to perform those essential functions." 29 C.F.R. § 825.312(b).

Here, it is undisputed that the City failed to provide a job description or list of essential functions when it sent Baines's FMLA designation letters and only required Baines "to present a fitness to return to work from a mental health care provider with insight into [her] condition." Since the City did not comply with the FMLA's mandates regarding an "ability to perform essential functions" certification, the only permissible inference at summary judgment is that it intended to require only an "able to resume work" certification. *Dykstra*, 183 F. Supp. 3d at 1227. Therefore, Baines's certification that she could return to work satisfied the certification requirement; "[t]o hold otherwise would effectively convert a requirement for a certification that an employee is able to resume work into a requirement for a certification that the employee is able to perform all the essential functions of her job." *Id.* at 1227-28. This would also "render … the prerequisites for an employer to require an 'ability to perform essential functions' certification, meaningless." *Id.* at 1228; *see also Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1004 (6th Cir. 2005).

The only avenue available to the City was to "contact the employee's health care provider for purposes of clarifying and authenticating the fitness-for-duty certification." 29 C.F.R. 825.312(b); *see also Brumbalough*. 427 F.3d at 1004 ("If

[the employer] decided that the same note was insufficient as a fitness-for-duty certification, it should have sought clarification from [the] doctor"). And even then "[t]he employer may not delay the employee's return to work while contact with the health care provider is being made." 29 C.F.R. 825.312(b). The City never sought clarification from Prothro-Wiley or Marks as it sought only to terminate Baines.

The City sent Baines for a FFD as pretext for terminating her after reporting/rebuffing her sexual harassers and due to its discriminatory animus toward someone taking "mental health pills." The evidence, taken in the light most favorable to Baines, shows Baines made no suicide threat and the City had no good faith belief Baines made a threat. No mental health provider suggested she could not perform her job. Courts have cautioned against using FFDs as a tactic to "harass employees or to fish for non-work-related medical issues and the attendant 'unwanted exposure of the employee's disability and the stigma it may carry," *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010) (citing 42 U.S.C. §12112(d)(4)(A)), and such caution is particularly important when the City memorialized its real purpose for sending Baines for a FFD it its February 23, 2017 email. The City forced Baines to undergo the FFD, during which Ojelade forced Baines to recount the vivid details of childhood sexual abuse for approximately five hours, to terminate her employment. Summary judgment on Baines's FMLA interference claim arising out of the City's failure to reinstate her should be reversed.

41

## VII. Retaliation and Pretext

### A. *The City used the FFD to retaliate against Baines.*

On February 23, 2017, after Baines repeatedly reported she was being sexually harassed and forced to perform substantive work during FMLA, and four days before she was scheduled to return to work from FMLA, the City articulated its intent to retaliate against Baines when it stated its desire for "additional ammunition for requesting a release." (Doc. 246-11.) This evidence alone – which the lower court completely ignored – compelled the denial of summary judgment on Baines's FMLA, ADA, and Title VII retaliation claims and ADA discrimination claim.

To establish a prima facie case of retaliation under the *McDonnell Douglas* framework, a plaintiff must show that: (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998). The City retaliated against Baines when it refused to reinstate her to her SACA position when Prothro-Wiley cleared her on February 27, 2017; subjected her to an abusive, sham FFD on March 28, 2017; and terminated her employment on July 17, 2017.

Baines undisputedly engaged in protected conduct under the ADA when she requested an accommodation for her disability the City continued to trigger on

February 24, 2017 and filed a charge of discrimination in March 2017; under the FMLA when she requested leave from December 6, 2016 through February 27, 2017 and reported the assignment of substantive work while on FMLA; and under Title VII when she repeatedly reported Shahar's and Rashad's conduct to Yancy, Thomas, Hampton, and Gevertz. The City did not dispute that the above-listed actions are adverse employment actions under *Burlington Northern Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). Instead, the City only made excuses – for its obviously discriminatory employment actions – the viability of which is a jury question.

Causation requires only that the decision-makers be aware of Baines's protected activity and that the protected activity and the adverse employment action are not "wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008). Here, the R&R properly concluded that Baines established causation because Gevertz harbored retaliatory animus beginning no later than February 23, 2017 when he wrote: "[t]he third is whether [Baines's] interpersonal challenges [in continuing to report violations of the law] have changed at all…. This is not a good sign of things to come. It may also give us additional ammunition for requesting a release along the lines Yvonne [Yancy] suggests," that Gevertz advised Berry on Baines's termination, and the City's rushed termination was the City's first opportunity to prevent Baines's return after Ackerman said he was about to clear Baines. (Doc. 299, 58-60.); *See also Godwin v. WellStar Health Sys.*, 615 Fed. Appx. 518, 528 (11th

Cir. 2015) (regarding cat's paw liability). Yancy created the plan to obtain "ammunition" against Baines and Hampton then obtained, as ammunition, the memo from Rashad she knew contained lies. The City then provided the ammunition to Ojelade, who forced Baines to undergo an abusive FFD examination, to assist them in punishing Baines for her audacity to speak out against sexual harassment.

Contrary to the lower court's conclusion, to establish that the protected activity and the adverse action are not "wholly unrelated," Baines need only show a close temporal proximity between her protected activities and the adverse actions. *Id.* Here, Baines established causation because her protected activities of reporting sexual harassment on December 6, 2016 and throughout February and March 2017, taking FMLA in January and February 2017 and requesting an accommodation on February 24, 2017 are temporally proximate to the adverse actions on February 27, 2017, March 28, 2017, and July 17, 2017, and the City's use of those requests and reports as ammunition to fire her. *See McCann*, 526 F.3d at 1377; *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986).

## B.    *Substantial evidence of pretext.*

### 1.    Pretext for the FFD.

The City's decision to subject Baines, and Baines alone, to a tainted FFD immediately after expressing its intent to get "ammunition" to fire Baines was direct evidence of pretext for discrimination and retaliation. In fact, the City's requirement

44

that Baines alone, and not her harassers, Shahar, Rashad, and Burnette, undergo a FFD is also evidence of discriminatory animus and pretext. Absent Baines's mental health, Baines's breakdown would have instead been deemed evidence of the severity of the harassment Baines suffered. A employer cannot poison the workplace to trigger a mental breakdown and then point to the mental breakdown they caused as the basis for their "concerns" that now must be "assuaged" in a sham FFD expressly designed to terminate the employee. The court erred in ignoring this damning evidence.

Yancy refused to reinstate Baines, placed her on administrative leave, and required her to submit to an abusive, sham FFD, claiming that Baines's managers had "legitimate concerns about your fitness to return to work" while Yancy and those same City managers, under Gevertz's advice and guidance, conspired to terminate Baines and forced Baines to work, unassisted while on FMLA.

The lower court erred in concluding that Baines posed a "potential suicide threat rais[ing] a legitimate concern about workplace safety." The City's own documentary evidence shows that forcing Baines to submit to a FFD was pretextual and wholly unrelated to any safety concerns. Specifically, the Gevertz ammunition email did not mention requiring Baines to submit to a FFD because of safety concerns.

Instead, the City sought "ammunition" to terminate Baines – and they

ultimately did so – because of her disability and in retaliation for her protected conduct. And Hampton and Yancy knew that in failing to protect Baines and in relying on Shahar, they were relying on a known repeat liar credibly accused of sexual harassment, which is likely why Yancy sought to bolster Shahar's lies with her own false statements in the police report. Yancy attempted to bolster Shahar's statements here when she claimed for the first time in this litigation that Baines also told her she was suicidal, despite that allegation being attributed only to Shahar in both the police report and the City's Position Statement filed in 2018. Such reliance on false statements and lies to bolster false statements can evidence "retaliatory animus." *See Scarbary v. Ga. Dep't of Natural Res.*, 245 F. Supp. 3d 1328, 1340-41 (N.D. Ga. 2017). This is especially so where Hampton and Yancy did nothing to obtain additional information from Prothro-Wiley concerning whether Baines was a threat to her own safety or the safety of others. *Id.* at 1339 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (statements that "cast[] doubt on the accuracy of [an individual's] interpretation of events" or "undermines [the] credibility and calls into question [the] motive behind" any adverse action "constitutes 'sufficient evidence to reject the defendant's explanation'"). "[T]he trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 134. "An employer's lack of concern about the accuracy of its

46

decision may support a claim of pretext, particularly where the possibility of error is great and confirmation could be easily obtained." *Connor v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1501 (11th Cir. 1985); *see also Martinez v. El Paso County*, 710 F.2d 1102 (5th Cir. 1983) (Defendants' failure to investigate shows that the stated reason for discharge is pretextual.).

Importantly, as further evidence of pretext, Hampton and Yancy failed to mention any claim that Baines posed a safety threat in the referral question to Ojelade, stating only that "the current assessment is designed to determine whether there are any psychological, interpersonal or behavioral barriers that would prevent Baines from continuing to function optimally in her role as a Senior Attorney for the city." (Doc. 253-5, 154.) The City then provided Ojelade with the ammunition email, characterizing Baines's request for help with work while on FMLA as an "interpersonal issue," thereby providing Ojelade with the answer to City's referral question. (Doc. 253-4.) In addition to the "ammunition" email, the City provided Rashad's memo, and long-rescinded discipline to further taint the FFD process and guarantee Baines's termination in violation the City's policy requiring that such separate employment matters be kept separate. (Doc. 265-15, Ex. 40, 107.) While Yancy claimed she only produced the memo to provide "the other side," the lower court ignored that Yancy's excuse conflicted with her testimony denying that Baines had ever complained about anyone to her. Thus, a jury can certainly find that

47

Yancy's claim she was providing "the other side" either shows that Yancy lied about her real purpose for injecting the memo into the FFD process or lied about the City's knowledge of Baines's repeated complaints of sexual harassment.

The City, through Yancy, then further intentionally biased the FFD by failing to provide Ojelade with a job description for her to use during the exam, despite it being hard to "determin[e] if someone could do a job if they didn't have the job [description]." With Yancy's assistance, Ojelade understood her assignment: terminate Baines.

Again, *Todd* is easily distinguished from this case because here the City did not sincerely believe Baines was a safety threat and there exists substantial evidence of discriminatory animus by the individuals alleging she was. For summary judgment to have been appropriate, the City must have sincerely believed Baines posed a threat, which the substantial evidence articulated above shows it did not. *See Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (summary judgment reversed sincerity of the decisionmaker's belief that the alleged bases for termination had occurred called into question); *Dickey v. Crawford Cty. Sch. Dist.*, 928 F. Supp. 2d 1342, 1356–58 (M.D. Ga. 2013) (summary judgment denied where defendant's purported justification for not renewing her contract was not sincerely held); *McMillan v. Dekalb Cty., Ga.*, 2005 WL 5121850, at *7–8 (N.D. Ga. Dec. 15, 2005) (evidence calling into question the sincerity of the defendant's purported

48

belief that the plaintiff had acted in a way warranting termination precluded summary judgment). In adopting the City's contentions, the lower court made credibility determinations and endorsed the City's animus toward mental illness and ignored the vast evidence of animus and pretext ignoring the summary judgment standard. For these reasons, summary judgment should be reversed on Baines's Title VII, ADA, and FMLA retaliation claims and ADA discrimination claim arising out of the City's failure to reinstate her and her forced FFD.

## 2.    Pretext for the termination.

The Court also erred in finding the City did not have a pretextual reason for terminating Baines. To reach this conclusion, the lower court discounted and again ignored the mosaic of evidence that discriminatory and retaliatory animus motivated the City's decision to terminate Baines and Yancy's admissions that support no other conclusion than Baines's termination was without merit.

A plaintiff will survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328-29. Despite the evidence that would allow a jury to infer intentional discrimination and

retaliation, the lower court erroneously asserts that Baines's evidence of pretext and animus relating to her termination relies simply on Gevertz's interview of Shahar (that Shahar lied about) in March 2017. This was not the evidence of pretext and animus on which Baines relied.

Specifically, Baines's evidence of pretext exists in the excuses the City made for Baines's termination and repeat violations of the City's various policies to achieve its illicit goal. The City claims that it terminated Baines for violating a policy prohibiting outside employment, but the policy did not apply to Baines because, as Yancy admits, she was never reinstated to active employment as a SACA. (Doc. 290, 57:5-59; Doc. 264-3, ¶ 18.) The City Code only prohibits attorneys who are actively practicing law to practice law privately, which Gevertz certainly knew when he advised Berry. (Doc. 298, 179:22-182; Doc. 265-15, 126.).[14]

Then, immediately after the City learned Baines was going to be cleared to return to work, Gevertz demanded Baines contact him within 24 hours after refusing to return Baines's call to discuss Shahar's harassment for four months. Gevertz's contacting Baines to terminate her when he refused to contact her to investigate her sexual harassment reports also evidences pretext as Yancy, when justifying the City's failure to investigate Baines's complaints against Shahar and Rashad, claimed

---

[14] Yancy claims she "presume[d]" that Berry made clear what was acceptable to his staff *after* Baines was terminated. (Doc. 298, 182-183.)

the City could not perform any investigations until Baines returned to work. The City then had Patrick (who was involved in the City's scheme to gather ammunition to terminate Baines) and Joan Clarke "investigate" the City's pretext for terminating Baines in violation of yet another City's policy due to their bias. In fact, due to Gevertz's bias (which was recognized by the lower court), the City's use of Gevertz to "investigate" on three occasions also violated the City's policy. The City's repeated deviation from its policies for Baines only (while adhering to such policies for Shahar) is strong evidence of pretext. *See Bass v. Bd. of County Com'rs, Orange County, Fla.,* 256 F.3d 1095, 1108 (11th Cir. 2001) (stating that employer's violation of its own procedure could be evidence of pretext).

As such, this Court should reverse the lower court's grant of summary judgment to the City on Baines's ADA discrimination and ADA, Title VII, and FMLA retaliation claims arising out of the City's discriminatory and retaliatory termination of Baines.

## VIII. <u>Privilege Inapplicable or Waived.</u>

Despite Gevertz's role in the decision to terminate Baines, the lower court found that the City's emails with Gevertz were protected by the attorney-client privilege and attorney work product doctrine. However, the lower court erred because the City's emails with Gevertz fall under the crime-fraud exception since they involve a crime or fraud, namely the violation of Baines's civil rights.

51

*Drummond Co. v. Conrad & Scherer*, 885 F.3d 1324 (11th Cir. 2018).

Even assuming privilege applied to the City's scheme, "[s]elective disclosure for tactical purposes waives the [attorney-client] privilege." *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1313 (11th Cir. 2021). The City disclosed to Ojelade a privileged email indicating that the City was looking for "additional ammunition for requesting a release [severance/separation]" during the sham fit-for-duty process to sway Ojelade's findings. (Doc. 298, 192; Doc. 265-15, 96-98.) Thus, the City has waived its privilege as to other communications regarding Gevertz's involvement in the adverse employment actions. *Teleglobe Communs. Corp. v. BCE, Inc.*, 493 F.3d 345, 361 (3d Cir. 2007) ("When one party takes advantage of another by selectively disclosing otherwise privileged communications, courts broaden the waiver as necessary to eliminate the advantage") "And 'once waived, the attorney-client privilege cannot be reasserted.'" *Meyer v. Gwinnett Cnty. Police Dep't*, 2022 U.S. App. LEXIS 18399, *21 (11th Cir. 2022) (cleaned up).

The City also waived privilege when Berry admitted he used outside counsel to determine whether to terminate Baines, because "when that party places privileged information in issue 'through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'" *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248-49 (11th Cir. 2020) (cleaned up). Baines is therefore entitled to discover the

nature and extent of Berry's communications with Gevertz. See *Meyer*, 2022 U.S. App. LEXIS 18399 at *21-22 (finding a party waived the confidential nature of communications by making them central to their claims).

Finally, the City's "good faith defenses" are the proverbial nails in the privilege coffin. *Cox Administrator United States Steel & Carnegie*, 17 F.3d 1419 (11th Cir. 1994) ("Having gone beyond mere denial, affirmatively to assert good faith, [the defendant] injected the issue of its knowledge of the law into the case and thereby waived the attorney-client privilege.") The City affirmatively asserted that its conduct was "taken in the good faith exercise of its duties and responsibilities imposed by law" and that it "made good-faith efforts to comply with the requirements of Title VII." (Doc. 6, ¶¶ 10, 16). Since the City is asserting a "good faith" defense, Baines is entitled to information to test their assertions. Thus, the lower court erred in sustaining the City's objection.

## IX.    <u>Sanctions for *Ex Parte* Communications and Violation of the Protective Order.</u>

Despite noting that "officers of the Court are to refrain from obtaining evidence by inducing legal violations by others and should be potentially subject to sanctions for abusive conduct if they obtain evidence involving another's breach of the law," the lower court refused to sanction Defendants. In fact, the lower court committed plain error when it refused to sanction Defendants' counsel, who met secretly with Baines's therapist in direct violation of HIPAA and provided

documents subject to the protective order. *Moreland v. Austin*, 284 Ga. App. 730, 734 (2008) *reversed on other grounds*, 284 Ga. 730 (2008); *Baker v. Wellstar Health Sys.*, 288 Ga. 336, 338 (2010) (*citing* 65 Fed. Reg. 82,462, 82,463 (Dec. 28, 2000)).

Defendants made no efforts to provide notice to Baines that they planned to meet with a represented Prothro-Wiley in advance of her deposition for alleged "deposition preparation," nor seek a HIPAA-compliant qualified protective order permitting them to engage in *ex parte* communications with Baines's health providers. They knew Baines would have objected to the meeting and counsel providing documents to Prothro-Wiley, whose testimony was limited to her treatment of Baines from 2016 to 2017 and unrelated to Baines's prior hospitalizations six to nine years before she ever treated Baines, and which were subject to the Protective Order.

By allowing Defendants' counsel to meet *ex parte* with Baines's therapist and ignore the Protective Order, the lower court eviscerated the protections the law bestows on individuals and rewarded Defendants duplicity. If Defendants wanted to comply with HIPAA, they would have asked permission before engaging in such an egregious overreach of Baines's privacy. Instead, Defendants decided to "ask forgiveness, not permission" and the lower court rewarded them for it. This ruling cannot be allowed to stand as it emboldens lawyers who conspire with their clients

to conduct secretive and overbroad forays into private information that they are not entitled to discover and to taint the provider's testimony.

## **CONCLUSION**

This Court should reverse the District Court and remand for further proceedings.

Respectfully submitted this 9th day of February 2024.

LEGARE, ATTWOOD & WOLFE, LLC

*s/ Cheryl B. Legare*
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com
Marissa R. Torgerson
Georgia Bar No. 848356
mrtorgerson@law-llc.com

55

## **CERTIFICATE OF COMPLIANCE**

Counsel for Appellant hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 12,918 words. This brief was prepared with MS Word, Times New Roman, 14-point font.

LEGARE, ATTWOOD & WOLFE, LLC

*s/ Cheryl B. Legare*
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com
Marissa R. Torgerson
Georgia Bar No. 848356
mrtorgerson@law-llc.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 9th day of February 2024 I filed **Appellant**

**Tamara Baines's Opening Brief** with the Clerk of Court using the CM/ECF system

which will automatically send email notification of such filing to the following

attorneys of record:

Jamala McFadden:  jmcfadden@theemploymentlawsolution.com
Halima White:  hwhite@theemploymentlawsolution.com

David Gevertz:  dgevertz@bakerdonelson.com
Hannah Jarrells:  hjarrells@bakerdonelson.com
Suzanne Lewis:  slewis@bakerdonelson.com

LEGARE, ATTWOOD & WOLFE, LLC

*s/ Cheryl B. Legare*
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com
Marissa R. Torgerson
Georgia Bar No. 848356
mrtorgerson@law-llc.com

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: (470) 823-4000
Facsimile: (470) 201-1212